We will be hearing one case today, United States v. Harris, and we will start with you, Ms. Pietropoulou. Did I pronounce that right? Very good. Welcome back. Thank you. Good morning, Your Honors. Renee Pietropoulou for Appellant Erik Harris. With the Court's permission, I'd like to request four minutes for rebuttal. Great. You might want to just move that microphone a little closer towards you. Can you? It says not adjustable.  No problem. I'll try to speak louder. Okay. This Court should narrowly hold that 922G3 is unconstitutional as applied to Erik Harris, a 21-year-old college student and marijuana user who was not intoxicated at the time of the charge of possession, who had no disqualifying convictions, and who the District Court found did not pose a danger to the community. The government… Not just using. He says when he uses, he uses just about daily, right? Right. Agreed-upon facts were three times a week. Well, no. He said several different things. He said it was three to four, and then when I'm using it's almost daily, and then if you have to average out, it's like five to seven times a week. You're right, Your Honor. We're not going to quibble about that. I was pointing to the agreed-upon facts at the hearing. He… So, I guess off and on, he was… Almost seemed like sometimes there was like a binge, other times there wasn't. He was saying sometimes he was free of drugs for a month or so, then he'd be back on. Right. He said things like that. I might go a year or so without using, and then I would use. But then… Yeah, we can accept he was a regular user of marijuana. And he described over that past year that it had been five out of seven days a month, right? So, for that, if we have that time period of the five to seven days, and we've got his admission that the night of the 13th, he was smoking when he lost the firearm, and then the very next morning went and purchased another one, why should we be concerned about the outer bounds of what it means to be an unlawful user in your void for vagueness challenge when, on the facts here, it seems so strong on the evidence that he was unlawfully using at the time that he was possessing? I'd push back on that, Your Honor. This was a motion to dismiss on agreed-upon facts, and the agreed-upon facts were he used every three days or five of seven days, as Your Honor noted. There was actually no evidence in the record that he was actually intoxicated or using when that firearm went missing. If you look back at what the hearing referenced, it was he was at a party, and then it turned out that the gun was stolen from him. So, there's no actual connection in the record in the agreed-upon facts that were part of the motion to dismiss. What about his statement to the police? Yeah, that was not a statement that he had the firearm on him and was intoxicated when the firearm was taken from him. It's very ambiguous. The government didn't even make that argument below. They said he was drunk one night, and the gun ended up being stolen. He says not only drunk, but that he was smoking marijuana that night. Yes, but the missing pieces was he in possession of the firearm that night. We know the next day he looked in his car, he went to the bar, he went to the house, he went to the neighbor's house. So, we don't know when he had the gun, when he was intoxicated. He was smoking and drinking that night when the gun disappeared. Is that right? He was smoking and drinking. Is that right? We actually don't know when the gun was stolen. That's the missing piece. But again, we're on a motion to dismiss on agreed-upon facts, and the charge is possession on the three days of purchase. So, that's what we're limited to looking at. We're not supposed to be looking outside the record at other instances of possession. What's missing here is evidence that he was actually intoxicated at the time of the charged possession. And why that matters is we're looking for a history and tradition that we can glean. You don't dispute that his statements on the forms are falsely certified that he was not on the law for marijuana possession? We are disputing that to a degree, Your Honor. What we're saying is if this court were to agree with us that 922 G3 is unconstitutional as applied to Mr. Harris, who was not intoxicated the day he's checking that box, then his statement on the form, I'm not a user, is not material. So, it didn't affect the sale. It was false, but you're saying it's not material because the law is unconstitutional. It also gets to knowledge as well. So, I don't want to quibble with words, but it's like, all right, do you know you're making a false statement? If you look at his interview with the police, he's saying it depends on how you look at it. I was not actively using when I made the purchase, and therefore my statement wasn't false. The police explained to him, hey, that's not the way the statute works. And he said, well, if that's the way you look at it, then technically it's false. So, I understand the question, Your Honor, but it gets at the vagueness of the statute, his knowledge, the materiality. But at least the morning of the 14th, where he smoked marijuana the night before, why doesn't that, in terms of its effect on a person, why shouldn't we presume that that carries over for the next 24 hours? And the 14th is the day of the interview, Your Honor? Apologies. Or is the 14th the day? No, that's the day that he's repurchasing the Smith & Wesson. Oh, I see what you're saying. Well, active intoxication of marijuana, the effects of someone who's smoking marijuana, that could be one hour to four hours. So, like, 24 hours wouldn't be the right measure. And it would seem to me that if Mr. Harris had walked into the gun store to purchase that firearm and he were actively intoxicated, there's no way that sale could have gone through. Someone would have noticed that he was actively intoxicated. The effects, I mean, I point the court to our ECF filing, number 69. We're talking about the effects of marijuana use on the brain, how long it lasts. But if I could get back to the principle that we're looking to drive, it's our position that the government's principle, which is that the legislature can disarm anyone, categories of people who present a special danger of misuse, that that principle isn't supported by the history, that it's so broad it waters down the Second Amendment right, and that it results in unreviewable deference to legislation. Isn't that language directly from Rahimi? It is not, Your Honor. Actually, that's a question that Rahimi left open. Justice Gorsuch made clear that the court was not deciding that question. Let's talk about historical analogs. Why isn't it, do you agree that Rahimi seems to allow that if someone poses an elevated risk of physical danger, that that person can be disarmed? Rahimi actually says if a judge makes a determination that a person poses a credible threat of danger, they can be temporarily disarmed. Yes. Okay. So why isn't it the case that if use of marijuana reduces inhibitions, impairs judgment, causes risky actions, et cetera, that that isn't enough to allow disarmament? It can't be used standing alone, Your Honor. I believe that the line has to be drawn at intoxication, and I take that from- So you don't have a dispute that you could have a law saying you may not possess a firearm while intoxicated, and the intoxication could include marijuana intoxication, not just alcohol intoxication. I think there could be a law that says that because it's tied to the history and tradition. Okay. Well, the fact is, this is someone who's using five days out of seven, right? He's not putting the guns away each time he goes and smokes and then getting them back. So the fact that you've got to be habitual, but if he's habitual, then why isn't that enough to say, no, he may not be in possession of guns during this repeated intoxication? Because that would be leveling up too much in generality. A person who's intoxicated, we can tie that to the history and tradition. A user of an intoxicant who's not actively intoxicated, we can't tie that to the history and tradition. And I say that because alcohol was widespread at the founding. Opium was even used at the founding. But the history and tradition didn't make the leap from actual intoxication to disarming people based on their use of intoxicants. Okay. But I guess my statement is not, you seem to say we can view the morning of the 14th in isolation. I'm saying the history and tradition would say he shouldn't have had a gun the night of the 13th, the night he smokes the marijuana. And the fact that he certifies he's doing this five to seven days a week means he's been repeatedly smoking marijuana. So why isn't that enough to say, no, what's the police explain? You can't be smoking this stuff and having the guns. He's got these guns that whole time. The undisputed facts are, yes, that he uses marijuana regularly, but there's nothing in the record that says he's using marijuana while he's, I'm sorry, he's intoxicated while he's in possession of the firearms. That's the missing piece here. Can Congress infer that when the requirement is not just someone who uses it, but someone who's a habitual user or an addict? If we construed the statute to limit it to people where it is a strong or reasonable inference that the person was in possession, if someone constantly using is in possession at that time, as opposed to a one or two time user. The legislature can certainly make policy judgments, but the policy judgments have to be rooted in the history and the tradition. And I'm not, I'm actually not asking a policy judgment. I'm asking about inferring the fact of possession during intoxication from the fact that he's admittedly a habitual user. I actually don't think that you can draw that inference. The inference of possession during a time of intoxication, just from the fact that he habitually uses, that it feels like a bridge too far. I think there has to be evidence that he's intoxicated while in possession. Your Honor's suggestion could be, I'm intoxicated on the deck at my house outside. And in my house, in my gun safe, I have a gun locked up. I think that's a fair inference to draw. But that wouldn't be consistent with the Second Amendment because it's not consistent with the principle. We're asked to look at the how and the why. So the how is the prohibition. The why here, it seems not just the concern about the danger that's posed by someone who is impaired while in possession of a firearm. But isn't the why also a deterrence effect? Just like with alcohol, where there's sort of a transition from a point where someone is not significantly impaired to significantly impaired. And if we think that that deterrent effect is part of the why of our historic laws, why doesn't that carry over to ensure that we, to think that we've got that same tradition in forming Congress's decision to prohibit those who are engaged in unlawful use of controlled substances. And so that they self-police because otherwise enforcement, just like with alcohol traditionally, would be so difficult. I actually don't think that deterrence is the proper why for these laws. And I'd point, Your Honor, to the mental health laws. I mean, we have certain concerns about whether they are a proper analog. But to the extent they are, what they do is they require a determination by two justices of the peace that a person is so far disordered that they pose a danger. That person can then be confined for the period of disorder where they're posing a danger and no longer. It's not a prediction that a person might enter into this state of disorder. There's an actual individualized determination. That's why I'm tying it to intoxication versus a person who may become intoxicated. And we talk about administrability of the rule, which is something that the government focuses on. First, I'd submit that's not correct, but it's also irrelevant. It's not correct because I can point, Your Honors, to various laws, including in places like Nevada and Wisconsin. There's an actual law in the books where you're prohibiting somebody from possessing a firearm while they are under the effects of a controlled substance. Wisconsin does the same thing. And it's irrelevant because the Supreme Court tells us we're not supposed to assess fundamental individual constitutional rights by how easy it is to afford somebody the full exercise of that right. That's not the right metric. In terms of the police being able to effectuate our principle, which is if you were to adopt a principle that G3 can be constitutionally applied to a person who's in a state of intoxication, that's typically the way these cases play out. A person is walking down the street or driving in a car. They roll down their window. Police smell marijuana. There's a gun on the passenger seat. Police conduct a field sobriety test. They're able to determine that someone is in a state of intoxication. That's not the way it played out here. Mr. Harris was brought in for questioning on an unrelated matter. He didn't have the guns in his possession. One was at his apartment in college. One was at his mom's house in his car. So there is no active intoxication while he's in possession. And the history and tradition, at most, require a state of intoxication. So as applied, that principle as applied to Eric Harris here is inapt. Can we look to a fair inference? If we had, say, somebody saying that they used every single day, which I recognize your client says at one point, but says some different things as well. But if we had someone saying that they smoked marijuana or used some controlled substance every single day, in that circumstance, would you say it's a fair inference that their possession was while they were using? I don't think so, Your Honor. Again, because what's missing is the connection to use while in possession of the firearm. Why are we going to infer that the person has the firearm in his pocket when he's using? It doesn't have to be in the pocket. There are plenty of gun laws. You're responsible for having control over the gun. We know from Bailey, and the trunk of the car accounts for a bunch of gun laws. Why would we infer it has to be in your pocket? And so we're talking about an act. We're not talking about possession or interpretation, right? Possession can be constructed possession. But we're talking about application of the Second Amendment. And so that's why I believe it has to be possession while intoxicated. Because the historical laws, it's military marching who are intoxicated while mustering. That's the kind of thing that we ban. A person who's riding, posing a danger while intoxicated, that's a person who's disarmed. We're not supposing that person might become disordered, like the mental health laws, and then disarming them on that basis. All right. So the mental health laws, you say, are distinguishable. And that has to do with the risk of someone taking a gun the person has control over and is using it. And you're saying that the laws governing drunkards using guns are actually about some kind of closer link to the person. Yeah, of course. We're saying that the mental health laws are distinguishable in the how and the why. But if you're going to accept them as an analog, at most they can be read for this actual impairment state to disarm people. I think if we're going with this idea that people who use controlled substances should be presumptively disarmed, then really we're in a world where we are deferring to a legislative judgment that is untethered to the history and tradition. OK. Let's say that there are other areas of our law where we make dangerous misjudgements. We know in bail, Salerno, civil commitment, an increased risk of dangerousness is enough to confine someone, to lock someone up, to incapacitate the person.  If, and this is an if, maybe you don't think it's the case, but if it's the case that someone poses enough of an increased risk of danger of misuse of a firearm when the person is habitual using marijuana, if that were enough danger to satisfy the civil commitment standards or to satisfy the pretrial detention standards, wouldn't it equally be enough to satisfy the disarmament standards? That someone poses a risk of becoming intoxicated? A risk of misusing the firearm, whether it's because of mental illness or because the person is cycling in and out of using, because he's a habitual user or an addict or something, if the elevated risk over leaving the person out pretrial over the next month or something is comparable to the elevated risk of someone who would be detained, because no set of conditions could reasonably assure the safety of the community, wouldn't the same analysis at least suggest that Rahimi's focus on physical danger means that that person could equally be detained and then maybe if the lesser measure of physical disarmament would be equally justified if equally needed to incapacitate that danger? In those cases there's a judicial determination that someone is posing a danger and here the court made the opposite judgment. They looked at Mr. Harris at that moment when he's admitting he's a regular user of marijuana. She determined he didn't pose a risk to any person or to the community. I think that what we're doing is we're going down the road of adopting the government's dangerous test. Rahimi didn't adopt that test and I submit there's a reason why it might not have adopted that test. Everything that we're talking about here takes us down the road of two, it inevitably devolves into means and balancing. All of the questions that we talk about with marijuana and drug users in general, it takes us... Okay, so you're saying this judge did not order this for him. What if this judge said, look, I'm supposed to use the least restrictive means. If I don't take away his guns, then I think I'd need to lock him up entirely. And the only way I'm comfortable leaving him out is by taking away his guns. Would that be a permissible bail restriction? I mean, it sounds like that's a determination that a person who uses drugs is dangerous or a person who uses drugs is a non-law abiding citizen. I think to be clear, I should point out that in Pennsylvania, the use of a small amount of marijuana, possession of a small amount of marijuana for personal use is a misdemeanor punishable by not more than 30 days. So the government isn't even relying on that sort of you're violating the law theory and trying to disarm Mr. Harris. You're not trying to violate the law. You could equally have a determination of a drunkard, which is not illegal. But if the judge says, I'm sufficiently concerned about this person's demonstrated lack of self-control and confidence, person has guns at home, I see two choices. One is to take away the guns. The other is to lock the person up pretrial. Could the judge reasonably decide that those were the least restrictive conditions needed to protect, not against risk of flight, clearly danger to the community? I'm struggling with the hypothetical, Your Honor, because Mr. Harris, the court, again, determined he didn't pose a threat, right? And the things that you're talking about. The future case where a judge had a greater concern about a future Mr. Harris. Right. I hear you. The thing about G3 and why I'm pushing back a little bit, Your Honor, is G3 is a felony conviction. It results in punishment, imprisonment for 15 years. You're talking about if you're going to stay out, can we take your guns? That's a totally different inquiry. And here, of course, they did take his guns. I'm talking about subjecting a person to a criminal law based on his use when there's no evidence connecting his use to his possession, his intoxication to his possession of the firearm. If we go at this another way, Rahimi seems to countenance categorical predictive judgments by a legislature, doesn't it? I actually don't think so, Your Honor. There's a statement by Justice Roberts about that. And Justice Gorsuch, then, in his concurrence, says we are not holding that. We're not making a preemptive determination that that's okay. So that's a question that's left open. Justice Barrett gives us some good guidance here. She says what the defendant was doing wrong is he's looking for a 21. It's a law that's disarming domestic abusers. That's not right. But what the government was doing was equally wrong. It was looking for a law that disarmed people just based on this feeling or judicial determination, if you will, that they might pose a danger if armed. And she said that was too broad. No member of the court adopted that position. That's the position that the government is advocating for here. We can disagree and have a debate about what's the right level of generality, but it can't be what Justice Barrett has told us is too broad a level of generality. When we look at the language that whether there's not the suggestion that the Second Amendment prohibits the enactment of laws, barring the possession of firearms by categories of persons who were thought by a legislature to present a special danger of misuse, followed by the court's reassertion, having said it over and over in Heller, McDonald, and now again in Rahimi, that the categories of things like the felon in possession law or for those who were mentally incapacitated, that those are not called into question. Why doesn't that tell us that the court is countenancing some categorical predictive judgments subject to a sort of rebuttal, a predictive showing? I'm sorry, an individualized showing on the other end. We've talked about the limits of the Rahimi holding in our briefing, including in the defender briefing and range to the defender amicus briefing. But what I would say is two things. Justice Roberts made that statement before segue into in this case, what we're saying is there's a determination by a court that a person, an individual person, poses a credible risk. And then he compared it to G8 and found that there was a good match. In terms of longstanding prohibitions, you mentioned mentally ill and you mentioned on felons. The felon ones, for the reasons I've already talked about, that felon prohibition, to the extent it's not dicta, and we believe it is dicta, of course, that doesn't apply here because we're talking about a misdemeanor punishable by not more than 30 days. The mental health regulations, again, we dispute whether they're longstanding at all, but what they do, if we're going to glean a principle from them at best, the principle is someone who is so disordered that they pose a current danger can be confined for the period of that impairment and no longer. And G3 is unconstitutional as applied to a person who's not suffering currently that kind of impairment while they're in active possession or possession. So if you reject the notion of something predictive of sort of a greater likelihood of misuse of firearms, how would this be enforceable? Would someone need to be tested moment to moment to see how impaired they are? No, I think if you're found to be in possession of a firearm and you're impaired, police do all the time field sobriety tests. And then you would be disarmed and be charged with G3. That's the way it works. That's the way it works in Nevada with their statute. They've got measures for determining intoxication. That's ordinary law enforcement. Police do this all the time. And ordinarily, like this is the rare G3 case, I submit, where there's no connection in the agreed upon facts between the physical possession of the firearm and active intoxication. When you look in the FedForth and the FedStop reporters, when G3 is charged, it's generally because police are pulling over a car and they smell the marijuana and then the field sobriety tests ensue. This is a very rare prosecution, which is why we submit you can narrowly decide this case. You can narrowly rule that G3 is unconstitutional as applied to Eric Harris, a user of marijuana who is not intoxicated at the time of the possession as charged in the indictments under the undisputed facts that the parties agreed to. You agreed, I thought, in some of your supplement letters that marijuana judgment, et cetera, lasts for four hours or so. Would you agree that at least for the four hours after someone smokes, that the person could then be disarmed? I think, I mean, without getting into the weeds, sorry, apologies. The science behind marijuana is sort of in flux, but it seems to me from the literature, a person who smokes marijuana can be intoxicated for one to four hours. And so much of that depends on the method of ingestion, what's being used. And so it's difficult for me to answer that question. Somewhere between one and four hours. It wouldn't have, you could arrest someone and the person wouldn't say, hey, I took 59 minutes ago, and that would not be a defense. Right, I'm not suggesting that G3 is limited to a person who has a blunt in his hand and the other hand has a gun. I'm talking about the state of intoxication. And as I said, that's something police routinely are able to ascertain. Some people have greater tolerance, some people have less. And would there need to be testing of the particular person's level of impairment? I really think it comes down to something akin to a field sobriety test. I mean, police can determine doing a field sobriety test if a person is intoxicated. It's not complicated. Now, if a person wants to come forward and say, I wasn't intoxicated, I wasn't staggering because I was intoxicated, I have vertigo. I mean, those kinds of things are determined in courts all the time, generally in state courts. We're talking about DUI. I don't envision it would be any different in this setting. Well, there are consequences of using alcohol, for example, effect on one's balance. That may not necessarily be the case when it comes to other controlled substances. Right? Yeah, you're right, Your Honor. The statute is so wide that it applies to any controlled substance that you use in an unprescribed way, for example. And that's why I think the proper measure isn't so much the drug but the state of intoxication. And how would that be tested with marijuana? I think if a person is stopped and the police suspect that they're intoxicated, they do a field sobriety test. If that person has a firearm beside them on the passenger seat, they're going to be disarmed under G3. Right. You keep saying field sobriety test, but that's testing for the symptoms of excess alcohol. They use those same tests for marijuana intoxication, marijuana driving while... That's for driving. I mean, here we're concerned about some different things like, you know, inhibition and aggression and some other things like that. Right.  Police do field sobriety tests even if a person's walking. That does happen. Marijuana, you're right, we've pointed in our papers to the fact that marijuana has the opposite pharmacological effects from alcohol in terms of aggression. Right. We've pointed out in our papers that the vast HHS's data-driven conclusion is that the vast majority of marijuana users are using marijuana in a way that does not lead to dangerous outcomes for themselves or for others. We're pointing to the way study in our papers that says the connection between violence and marijuana use is spurious. But I submit that when we're getting into all these questions about is marijuana used, are users just ifso facto dangerous because they use marijuana, that is leading us down the road to means-ends balancing. At best and at worst, it's really just judicial deference to these policy decisions that Bruin and Heller tell us are sort of off-limits at this point. The policy decision has to be tethered to the history and tradition. And the history and tradition, again, is intoxication. There were plenty of alcohol users and abusers at the time of the founding, and the founders did not see fit to disarm people who used intoxicants unless they were in a state of intoxication. And if we're leveling out to look at just users of intoxicants, I think we're committing the same mistake that Rahimi said was equally wrong, is looking for a twin. We're looking for a historical analog that's similar to the... We're looking for regulations that's similar to the history, and then disarming people to a degree that went beyond what the founders did. And Rahimi tells us that's just not permissible under the Second Amendment. You said earlier that you would go out four hours. So for different controlled substances, would there be a different period of time as one was either doing enforcement or the sort of self-policing of possession of a firearm after using? I mean, I don't want to say that I'm conceding absolutely four hours in every case. I don't think that's what it is, Your Honor. I think it's a state of intoxication, and I think that's something that can be determined in the moment when a person is possessing a firearm. What I'm objecting to is this prophylactic disarming of users of intoxicants based on a prediction that they will become intoxicated and will at that moment go get their firearm and act in a way that is posing a danger to others. Those kinds of predictive judgments untethered to the conduct are not permissible under the Second Amendment. That's basically what Judge Bibas said in his Logitar dissent, those kinds of predictive judgments untethered from the evidence. Okay, we'll hear from you in rebuttal. Thank you. Thank you, Your Honor, and may it please the Court. Andrew Noll on behalf of the United States. Drugs and guns are a dangerous combination. Illegal drug use can impair abilities. When you filed the November of 2023 response asking to what extent there is scientific evidence, that was the first sentence you used. Yes, that's correct. Explain how dispossession laws regulating the mentally ill or the intoxicated at the time of their mental state was temporarily altered. How does that impose a similar burden to 922G1? Sure, Your Honor. So let me make two points in response to that. Let me start with the mentally ill-related regulations. We do not read those. Let's try intoxicated. That's probably the closest to this. Sure. Let's start with the intoxicated statute. So Your Honor is correct that many of the precursors in history related to the carrying of firearms during a time in which a person is intoxicated. But there were also sale restrictions, which we point to in our brief, that prevented the sale of firearms to individuals who either are intoxicated or, later in the early 1900s, people who are habitual drunkards. And so we think those regulations are quite similar to the regulations that are imposed on possession of individuals. If somebody is intoxicated, then they are to be disarmed while they are intoxicated, right? So many but not all of the requirements. At the time of the founding? So at the time of the founding, we have mostly regulations that are limited to militias. But I'll be very clear that Rahimi made clear that a court should not look specifically and only to the regulations that were in existence in 1791 at the time the Second Amendment was founded. And I think there's nothing in the history which shows an increasing amount of regulation. What else should you look at then? You can look at increasing history across time so long as it's consistent with the principles that can be discerned from the underlying Second Amendment history. And I think here, unlike the circumstance in Bruin, where there were concealed and open carry laws that were in conflict with some of the outlier statutes that Bruin found, for example, in the Tennessee prebellum statute or the Texas postbellum, where there were like broad outlier statutes that were in conflict with, for example, contemporaneous court decisions or other statutes that were consistent at the time. Here, we have an increasing amount of regulation as to individuals who are intoxicated. But that's against no backdrop that we can discern of indications that the prior regulations were perceived to be a constitutional limit. I mean, as Justice Barrett explained in her concurrence, we don't have a use it or lose it view of the regulation of firearms. Rather, we have to ask whether the history… But was there any law at the time of the founding that permanently would disarm an individual who was intoxicated? So, not with respect to intoxication, Your Honor, but I would just… And isn't this like intoxication? So, I think it is like intoxication in some ways with respect to the period of time during which an individual is presently intoxicated. But as we make quite clear, because marijuana is an unlawful substance, we think there are additional concerns about the unlawful nature… It's certainly a controlled substance under federal law, although it's one of those wink, wink, it's not really enforced that much. So, Your Honor… Unless you're obviously trafficking in it. With respect to firearms, Your Honor, we regularly enforce 922 G3. Normal possession, Your Honor, mere possession, I grant you the government has traditionally not enforced on its own. And I think that this unique combination of drugs and guns is something the government consistently regulates and consistently brings prosecutions. And I would also just emphasize to the extent, Your Honor, is expressing some concern about the relisting of marijuana potentially as Schedule 3. The DEA and HHS have proposed relisting and kind of limiting the listing of marijuana but not delisting it entirely. All of the controlled substances prohibitions will still apply. But just to bring it back to my more general point, Your Honor, I think it would be error for this court to look only to regulations that exist in 1791, specifically after Rahimi where the court went to pains to say that the government… Where do you go beyond… Can you go to… At this point, the Supreme Court has told us they're not even… They haven't made a decision on whether to look at the Reconstruction Amendments. So they haven't made a decision. They haven't kind of said one way or the other whether later history is necessarily relevant. What I can say, though, is both in Bruin and Rahimi, the court made quite clear that even 19th century history can be relevant to the extent it's a continuation of earlier history. And I guess what I'm suggesting to you, Your Honor, is the extent to which intoxication and mentally ill statutes, as two of our primary analogs, are ones in which there's an increasing level of regulation as societal conditions change, both in terms of the concern about these issues, but also the technological advancements in firearms and the movement towards people towards urban areas, all show a clear through line of the government's authority to make predictive judgments about danger. That is not kind of counteracted by any other contemporaneous history that suggests earlier restrictions were made to the extent and the full limit… But what is the historical justification for permanently disarming someone not currently under the influence of marijuana? So, Your Honor, let me be very clear. 922 G3 is not a permanent disarmament. It is only a disarmament that exists so long as a person is engaged in unlawful drug abuse. 922 G3 refers specifically to an individual who is an unlawful user, and for that reason, it only extends… So if you're not an unlawful user, what do you do? You go get a declaratory judgment? No. I mean, if you have stopped using marijuana regularly and habitually, the statute doesn't apply to you. You can sign the form and say you are not currently an unlawful user. That's an A6. We're talking about G3 right now, aren't we? We are, but G3 is framed in the present, a person who is an unlawful user of a controlled substance. So the government would not take the position that someone had used once three months ago at a party was subject to this prohibition? No, Your Honor. This Court's decision in Augustine, in fact, was quite clear that a single use is not a user of a controlled substance. Okay, and if someone was an habitual user until six months ago, the government would not think it could prosecute that person because of the present tense in G3? That's exactly right, Your Honor. Now, let me ask you the question I was asking Ms. Pietropalo. Someone is cycling in and out of, okay, I smoke last night, then I sign the form this morning, then I smoke tonight, et cetera. How should we understand that for purposes of inferring whether the person is impaired and possessing at the same time? So, Your Honor, my threshold answer to you, of course, is we don't need actual impairment and possession at the same time. And I understand that argument that it may be enough that there's just danger from that. But if Ms. Pietropalo was right and we needed actual impairment, could we infer that or could a jury be permitted to infer that and it would be something that the defendant could argue against and raise defenses on? Yes, Your Honor. If you thought that was necessary either under the statute by its terms or for purposes of the Second Amendment, I think there would be a jury question. Of course, we're here on a plea agreement before trial, so we don't have full fleshing of the facts. But you could, I think, infer, just like juries regularly infer from a prior kind of last use, the present tense use of a controlled substance. And often these cases look at was there residue in a person's house or a person's car? Were there other drug paraphernalia around? But I don't think any of those concerns are brought up by this case. And if I could just kind of clarify a few specific facts about this case. First of all, possession is, of course, a continuing offense. So although the indictment does set forth the specific firearms that Mr. Harris was charged with possessing and the specific days he purchased them, the indictment doesn't charge him as being an unlawful user only on those specific dates. Rather, 922 G3, unlike any possession statute, is a continuing offense. We can fairly read the use of the simple present tense in 922 G3 to include the imperfect present tense, is possessive, right? But this is not defined neatly that it has to be at the moment that the person signs the form. Yes, I think that is how both this court in Augustine and every court of appeals to constrain Section 922 G3 reads the statute. You have to have evidence that at the time of possession, the person is then a regular and habitual user. At the time being understood, there's a time frame, there's a period, and it's a broader period than the one Ms. Petropaulo argues for. That's correct. If the statute said a person is possessing a firearm while using a controlled substance, I think we would agree then that that is a statute tied only to the point of intoxication. But as this court and, again, every court of appeals to consider the language of Section 922 G3 has interpreted the statute, it refers more broadly to the period of someone is an unlawful user. And this goes back to my point about this being a temporary restriction. An individual, of course, can cease his unlawful drug abuse, and as long as he's no longer a user, can then go and obtain firearms. What are the boundaries of that? At what point, when someone is used, at what point are they no longer an unlawful user? So, Your Honor, the statute requires an inference that the person is a present user. I think to the extent you're asking about cases in which, you know, juries or government has argued about past use as an inference of present use, I think the inference gets quite weaker as time goes on. But I would just urge you to look at the cases that have actually been prosecuted, as Ms. Petropaulo pointed out. Many do include present tense intoxication, but even those that don't at least include instances in which a defendant has said he used, you know, several weeks prior, but there is a user amount of drugs found on his person, or there is some other evidence from which the jury can make a factual inference that the individual is presently at the time of possession an unlawful user. I'd point you to the Morales-Lopez case from the Tenth Circuit that we cited in 28J letter, where the Tenth Circuit made this point. The last use the defendant admitted to in that case was five weeks prior, but there was a host of evidence about what was found in his vehicle at the time that led the jury to be able to infer he remained an unlawful user. And I think in this case, you know, we have a narrow three-week period from February 25th to March 14th, where Mr. Harris purchased three firearms, and by his own admission, he at least used every three days, including the night before when he lost one of those firearms, and the next day purchased another firearm. To Ms. Picciopolo's assertion that the firearm was stolen, I just point this court to page 35 of the transcript that you ordered, where Mr. Harris says he misplaced the firearms. And then on page 74, he said even on the day of his actual police interview, the firearm was in the side pocket of his car in a holster, and he admitted during the interview he had smoked marijuana that very morning. And last, I would just point you, in terms of the facts of this case, to Ms. Picciopolo made reference to his release on bond, and that's docket 13 of the district court. The conditions of bond specifically required that Mr. Harris not possess a firearm and that he commit no new federal offense. And so I don't think it's even correct to say that the district court made any type of inference about Mr. Harris's danger vis-a-vis firearm possession, because the conditions of his release depended on him not actually possessing a firearm during that time. So I don't think the release on bond says anything about his continued danger. How would you distinguish the Fifth Circuit case and Connolly? Yes, Your Honor, I'm happy to talk about a couple errors, but I think there's two macro errors in Connolly that the Fifth Circuit made. The first and most important is particularly after Rahimi. The Fifth Circuit erred in viewing each of the analogs in isolation. If you just look at how the Fifth Circuit referred to the mental illness analog, it rejected it out of hand because it thought intoxication was a closer analog, similar with respect to a broader dangerousness analog, which the court erroneously said was limited to political opponents, although that's decisively something Rahimi Court rejected and said at the founding there was still, citing the Militia Act, there remained a historical analog for individuals who were dangerous. So I think, first of all, the court focused narrowly only on intoxication to the exclusion of other analogs, which the Supreme Court made quite clear must be looked at together. Second, with respect to— What is the closest analog? Is it intoxication, mental illness, or danger? So, Your Honor, we don't need just one analog. I want it very clear. Rahimi says we do not need a single analog. I think the closest that this court can look to is the intoxication analog. But what I would say is there are clear distinctions between the use of a lawful substance like alcohol and an unlawful substance that might well make a legislature not want to ban firearm possession during even periods of interim use that they do with respect to a controlled substance. And I would just also say with respect to the mental illness analogs, we cite both Blackstone and Coke, which make very clear that historically individuals who were considered mentally ill have lucid intervals, and yet individuals were still able to either have their property taken during their overall period of impairment or confined, and as later analogs were enacted in the 1800s and 1900s, individuals who were considered of sound mind or otherwise had mental illnesses were regulated with respect to their firearm use in parity with both either habitual drunkards or individuals who were... Okay, so that was the first error. Yeah, what was the second? I'd like to hear you go on to the second. So, sorry, the first error was the not together. The second was with respect to the intoxication statutes. The Fifth Circuit read the history to limit the government's ability to regulate to only periods of time in which individuals were intoxicated and only to impose carry restrictions. And I think to make that assumption requires making two historical errors, especially in light of Brahimi. The first is assuming that the historical analogs were ones that showed that the legislature exercised its legislative authority to the maximal extent of its constitutional powers. And we just don't think that that is a valid inference to draw from the history, in particular because, as I was saying, as the 1800s wore on, you had instances in which individuals could not... governments imposed statutes or enacted statutes that limited sale, total sale, to individuals who are habitual drunkards. Okay, but that's if we can look into the 1800s. What do you think of the Eighth Circuit's decision in Beasley? So Beasley, in fact, Your Honor, we think is right on the bottom line that 922G3 is constitutional facially, but we think it has a number of errors as well. And I think if the Court could just compare Connolly and Beasley, it comes to a number of totally contrary conclusions, which I think just give indication why both analyses are flawed. To the Eighth Circuit's benefit, that was a pre-Brahimi case, of course. But, you know, Beasley found that the intoxication statutes were categorically not relevant because they didn't bar possession, whereas that was the primary indication that... or analog that the Fifth Circuit found relevant. Beasley found that there was actually a clear instance or history of use of controlled substances beyond alcohol at the founding, including marijuana, which we think is just not at all true with respect to the history. And that's, again, contrary to Connolly, which found there was no contemporaneous use at the time of the founding. Beasley also found the mental illness analogs the most powerful and rejected both the view that there needed to be a judicial finding before an individual could be disarmed and that there were, you know, temporary periods of lucidity during which an individual could not be disarmed. Again, Connolly views both of those to the contrary. But I think by and large what I would say is I think Beasley, again, it was before Brahimi, so it didn't have the benefit of the Supreme Court's clear admonition that this isn't a law trapped in amber. And, you know, Justice Barrett's point about legislatures exercising their maximal legislative authority. I think Beasley focused too exclusively on the very, like, kind of individual case-by-case determination that we just don't think is necessary under the Second Amendment. I think Congress can make predictive judgments, which can be reviewed judicially on the back end. But I don't think Beasley's argument that there are, you know, case-by-case adjudication that's required for Second Amendment purposes holds out scrutiny. General, you in your third supplemental brief make the argument that there's an increased danger when dealing with unlawful substances, that there's additional crime to obtain money to buy the drugs, et cetera. How much of your argument relies on us agreeing to that as a source of danger as opposed to merely the use of a substance that would impair the user? So I don't think our argument depends on it. I think it's a quite strong indication of why the statute is constitutional. But I do think this Court could find that at a minimum, while someone is a regular and habitual user, at any point in time they present a risk of becoming so impaired that they will, you know, for that period of their unlawful use. And we don't think that's that different than the mental illness, for example, analogs. But I will say, and I think it was our second supplemental letter brief, we pointed to the specific floor statements of both the House and Senate, and the statement by the President when the first 922G3 analog was passed, which made quite clear there was a concern about the criminality with respect to guns could be put by unlawful users. And I do think that is a strong and constitutionally valid reason that Congress can temporarily disarm individuals while they continue their unlawful drug abuse. Unless the Court has any further questions, we'd ask that you affirm Mr. Harris's convictions. Thank you. So to justify its view that you can disarm people during periods of lucidity, the government focuses on a policy that drugs and guns in combination are dangerous. The problem here is G3 doesn't require guns and drugs to be used in combination, and that didn't happen in this case. The government's really pointing to 924C cases. 924C has been found to be constitutional under the Second Amendment, using a gun in connection with drugs. They're focused on systemic violence that's endemic in the drug trade, doesn't apply to marijuana in the same way that it would to other drugs. Marijuana is legal in 23, 24 states, three territories, including four of the states that touch Pennsylvania. Marijuana use is decriminalized, and even though recreational marijuana use is not legal in Pennsylvania, it's been decriminalized in many municipalities and cities, including Pittsburgh and Philadelphia. So the idea that a marijuana user, all of the things that the government talks about, you need to commit a crime to pay for your drug habit and you're going into the drug milieu, none of that apply in the context of marijuana. It's misplaced in the context of marijuana. The government talks about the timing of the laws. In Lara, the Third Circuit said this is a federal law, and so we are looking at 1791. But even if you're going to go beyond 1791, the Reconstruction Era laws, the four that the government cites, are very limited to intoxicated carry or selling to someone who's actually intoxicated. The history and tradition is tied to intoxication. I didn't hear the government identify the principle that it's gleaning from the history. I heard it more talking about policies and deferring to legislative judgments. Again, legislatures can make predictive judgments, but they have to be tied to the history and tradition. What about the history and tradition of just disarming groups of people who were viewed as posing a danger? There is no history and tradition, I would submit, Your Honor, that survived into the founding. Rahimi told us that laws disarming Catholics and political dissidents did not make it into the founding, like laws like the Loyalist Laws. And then we know that laws that disarm categories like the Odious Laws that disarm blacks or Native Americans, those people were written out of the people, and so they don't form part of the historical tradition that we're looking at for Second Amendment purposes. If I could just talk one second about the as-applied challenge and what that looks like. This was a motion to dismiss on undisputed facts. Those facts, as recounted by the United States Attorney at the oral argument, dealt with his possession on three days. There was no evidence that he was intoxicated while he was in possession of a firearm. And I would point the Court to the recent decision in the United States v. Moore from the Third Circuit. The Court was doing an as-applied challenge to 922g1. They looked at the indictment, which charged a person with a prior felony conviction not to possess a firearm. That prior felony conviction the defendant had conceded in that case resulted in a sentence that the defendant was currently serving when he was charged with the 922g. The Court determined that there was a history and tradition of disarming people who were serving a sentence, and then it concluded that 922g1 was unconstitutional as applied. g3 would work in exactly the same way. It's applying to a person who's a user of a controlled substance not to possess a firearm. The history and tradition is tethered to intoxication while in possession of a firearm. So Mr. Harris, the statute is unconstitutional as applied to someone who's not actively intoxicated at the time of the charge of possession, based upon, again, the agreed-upon facts in the motion to dismiss. Okay. We'd ask the parties to prepare a transcript and to share the costs. And we thank you for your many supplemental briefs. We've all worked through the multiple developments in this area of the past couple of years. Very well briefed and argued. So we'll take the case under submission. Adjourned for the day. Thank you.